UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>VINCENT CLARK | No. 3:12-cr-104 (SRU) |

# ORDER

On April 5, 2013, Vincent Clark pleaded guilty to one count of an indictment charging him with conspiracy to distribute and to possess with intent to distribute 280 grams or more of crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A). *See* Plea Agreement, Doc. No. 842 at 1; Indictment, Doc. No. 1. He was sentenced by District Judge Ellen Bree Burns on December 5, 2014 to 140 months' incarceration and 5 years' supervised release. *See* Judgment, Doc. No. 2153. Clark is currently incarcerated at Federal Correctional Institution Schuylkill ("Schuylkill").

On October 7, 2020, Clark, through counsel, filed a motion for sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i), as amended in 2018 by the First Step Act. Clark contends that his underlying medical conditions, coupled with the increased risk he faces of contracting Covid-19 while incarcerated at Schuylkill, warrant sentence modification to time served. *See* Mem. in Supp. of Mot. to Reduce Sentence Doc. No. 2895 ("Def.'s Mot.) at 1. He cites additionally to the lengthy sentence he received as compared with his co-defendants, and the fact that the length of his sentence reflected an unwarranted disparity between offenses involving crack and powder cocaine. *Id.* at 4-5. Finally, he points to his progress toward rehabilitation while incarcerated to argue that release is warranted. *Id.* at 5.

1

On October 14, 2020, the government filed a memorandum in opposition to Clark's motion for release. The government contends that Clark has not met his burden in establishing that his medical conditions constitute extraordinary and compelling reasons for release. *See* Mem. in Opp'n. to Mot. for Release, Doc. No. 2899 ("Govt.'s Mot.") at 1. The government additionally contends that Clark's sentence was not unwarranted in light of his extensive criminal history. *Id.* at 10. Finally, the government maintains that the disciplinary infractions Clark has received while incarcerated undermine his claims of rehabilitation. *Id.*

For the following reasons, I **grant** Clark's motion for sentence reduction.

I.  **Standard of Review**

Until 2018, the statute authorizing motions for sentence reduction (or "compassionate release") vested the exclusive authority to bring a motion with the director of the Bureau of Prisons ("BOP"), based upon a showing of "extraordinary and compelling reasons" warranting relief. *See* 18 U.S.C. § 3582(c)(1)(A) (2017). The statute did not specifically define the phrase "extraordinary and compelling"; instead, under 28 U.S.C. § 994(t), the Sentencing Commission was tasked with describing "what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The Commission ultimately did so in Guideline Section 1B1.13, which provides in part that "upon motion of the Director of the Bureau of Prisons," a court may reduce a sentence under Section 3582 if "extraordinary and compelling reasons warrant the reduction" and "the defendant is not a danger to the safety…of the community." U.S.S.G. § 1B1.13(2).

Although section 1B1.13 does not specifically define the phrase "extraordinary and compelling reasons," application notes (1)(A)-(D) to that section provide in part that extraordinary and compelling reasons warranting relief may exist where a defendant is "suffering

from a serious physical or medical condition." *Id.* at n.1(A)(ii)(I). Finally, application note 1(D) includes a catch-all provision providing for release where the Director of the BOP determines "there exists an extraordinary and compelling reason other than" the reasons enumerated. *Id.* Despite the broad discretion afforded to the BOP to define what constitutes extraordinary and compelling reasons for sentence reduction, the BOP has used its power to bring motions under section 3582 very sparingly. *See* U.S. Dep't of Just. Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* 1 (2013), https://www.oversight.gov/sites/default/files/oig-reports/e1306.pdf (finding that on average, only 24 incarcerated people per year were released on motion of the BOP).

In 2018, Congress moved to expand the use of motions for compassionate release by passing the First Step Act ("FSA"), which amended Section 3582 to allow defendants to file motions for sentence reduction directly, following the exhaustion of "administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." *United States v. Brooker*, 976 F.3d 228, 233 (2d Cir. 2020); 18 U.S.C. § 3582(c)(1)(A)(i). In addition to expanding access to motions for compassionate release based on extraordinary and compelling circumstances, the First Step Act made retroactive certain provisions of the Fair Sentencing Act, which was enacted in 2010 with the goal of reducing the disparity in sentencing between offenses involving crack cocaine versus those involving powder cocaine. *Dorsey v. United States*, 567 U.S. 260, 263 (2012); *United States v. Martin*, 974 F.3d 124, 150 (2d Cir. 2020).

Despite the significant changes made to the statutory scheme governing motions for sentence reduction, the Sentencing Commission has failed to update section 1B1.13 since the FSA was passed. *Brooker*, 976 F.3d 228 at 233. As a result, the language of section 1B1.13 and the

associated application notes still define "extraordinary and compelling reasons for release" only in the context of motions brought by the BOP, and not by defendants directly. *Id.* That tension between the language of section 1B1.13 and the recently enacted FSA left unclear the standard that a district court reviewing a motion brought directly by a defendant should apply. *See United States v. Fox*, 2019 U.S. Dist. LEXIS 115388, at *4-5 (D. Me. July 11, 2019) (collecting cases). Some courts concluded that section 1B1.13's narrow definition of "extraordinary and compelling reasons" for relief remained binding even after passage of the FSA. *Id.* Others, however, concluded that a court reviewing a motion brought directly by a defendant had full discretion to determine what factors constituted "extraordinary and compelling" reasons for relief under section 3582. *Id.*

The Second Circuit addressed that division in *Brooker*, ultimately concluding that a district court considering a motion for compassionate release brought by a defendant is not bound by the definition of extraordinary and compelling reasons for reduction contained in section 1B1.13, and is instead free to "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *Brooker,* 976 F.3d 228 at 237. "Nothing…in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *Id.*

The decision in *Brooker* additionally made clear that a court may consider "the injustice of a defendant's lengthy sentence" in deciding a motion for compassionate under section 3582. *Id.* at 238; *see also United States v. Vargas,* 2020 U.S. Dist. LEXIS 220531, at *13 (S.D.N.Y. Nov. 24, 2020) (collecting cases and noting that "courts have considered the severity or length of a defendant's sentence as part of their evaluation" under section 3582); *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020) (affirming district court's consideration of severity of sentence as

proper grounds for release under section 3582). In considering whether a sentence is unjustly lengthy, courts have considered disparities between similarly situated codefendants, among other factors. *See, e.g., United States v. Haynes,* 456 F. Supp. 3d 496, 514 (E.D.N.Y. 2020) (considering "drastic severity" of sentence as compared to codefendants' term); *see also United States v. Millan,* 2020 U.S. Dist. LEXIS 59955, at *27 (S.D.N.Y. Apr. 6, 2020) (granting motion for release in part to avoid sentencing disparity between defendant and co-defendants).

Courts have additionally considered the FSA's overall purpose of reducing the overly punitive effects of the statutory schemes that govern sentencing when determining whether extraordinary and compelling circumstances exist. *See, e.g., United States v. Marks,* 455 F. Supp. 3d 17, 36 (W.D.N.Y. 2020) ("[t]he First Step Act is instructive, inasmuch as it evidences Congress's intent to mitigate the harsh and sometimes unjust effects of the sentencing laws"); *see also Haynes,* 456 F. Supp. 3d 496, 514 (considering harshness of sentence "as compared to sentences imposed on similar and even more severe criminal conduct today"); *Vargas*, 2020 U.S. Dist. LEXIS 220531, at *13 (collecting cases and noting "numerous defendants facing sentences imposed under….since-invalidated laws or practices have been granted compassionate release").

Finally, although rehabilitation alone may not be the basis for sentence modification, rehabilitation can interact with other factors to create an extraordinary and compelling reason for a sentence reduction." *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 181004, at *8-9 (S.D.N.Y. Sep. 30, 2020); *see also United States v. Rios,* 2020 U.S. Dist. LEXIS 230074, at *12 (D. Conn. Dec. 8, 2020) (defendant's rehabilitation weighed in favor of release despite extensive criminal history).

The expanded discretion afforded to district courts considering motions for sentence reduction on motion of a defendant comes amidst the global Covid-19 pandemic, during which

courts in this Circuit and around the country have granted motions for compassionate release where a defendant establishes that he or she suffers from an underlying condition that increases the risk of developing severe complications from a Covid-19 infection. *See, e.g., United States v. Colvin*, 451 F. Supp. 3d 237 (D. Conn. 2020). In determining whether a particular condition increases the risk of developing complications, courts have relied on guidelines published by the Centers for Disease Control and Protection ("CDC"). *See, e.g., United States v. Rojas,* 2020 U.S. Dist. LEXIS 238647, at *2 (S.D.N.Y. Dec. 18, 2020); *United States v. Vondette*, 2020 U.S. Dist. LEXIS 237750, at *6 (E.D.N.Y. Dec. 17, 2020). Courts have additionally recognized the high risk of spread of Covid-19 in a prison environment, where inmates are forced to live in close quarters without the ability to social distance and often do not have access to hygienic products such as hand sanitizer. *See, e.g., United States v. Park,* 456 F. Supp. 3d 557, 560 (S.D.N.Y. 2020) ("the nature of prisons…puts those incarcerated inside a facility with an outbreak at heightened risk"); *see also* The Marshall Project, *A State by State Look at Coronavirus in Federal Prisons*, https://www.themarshallproject.org/2020/12/18/1-in-5-prisoners-in-the-u-s-has-had-covid-19 (finding that since the outbreak of the virus, "at least 2,019…prisoners have died of coronavirus-related causes").

Despite the expanded discretion afforded to courts to determine where extraordinary and compelling reasons warrant sentence modification, however, a court reviewing a motion under section 3582 is still required to ensure that a modification would be consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a). 18 U.S.C. § 3582(a); *see also United States v. Madoff,* 465 F. Supp. 3d 343, 348 (S.D.N.Y. 2020). Accordingly, a court must consider the seriousness of the offense, the risk to the public from further crimes by a defendant and the need to adequately deter criminal conduct, among other factors. 18 U.S.C. § 3553(2)(A)-(D). On

motion for compassionate release, a defendant bears the burden of establishing that sentence reduction is warranted. *Madoff* at *11; *see also United States v. Morales*, 2020 U.S. Dist. LEXIS 151583, at *9 (D. Conn. Aug. 20, 2020).

## II.     Background

Clark was indicted in this multi-defendant case on May 15, 2012, following an extensive investigation by federal and local law enforcement into a drug trafficking operation in New Haven and the surrounding area. *See* Govt's. Mot. Doc No. 2899 at 3; *see also* PSR Doc. No. 971 at ¶ 28-32. Clark was described at sentencing as the "right-hand man" of Kevin Wilson, the leader of the drug trafficking operation. *See id.; see also* Trans. of Sentencing H'rg. Doc. No. 2283 at 37. Clark was accused of converting powder cocaine to cocaine base ("crack") and then working with Wilson to sell the drugs in and around the New Haven area. *Id.* Law enforcement officials ultimately determined that the quantity of cocaine base attributable to Clark was "at least 280 grams but less than 840 grams." *See* PSR at ¶¶ 32, 99.

Clark pleaded guilty to on April 5, 2013. At the time of the plea agreement, it appears that both Clark's counsel and the government were unsure whether Clark's prior convictions qualified as predicate offense for career offender designation at sentencing. *See* PSR Doc. No. 971 at ¶ 33. Conceding that it was unable to meet its burden of establishing that Clark qualified as a career offender at the time of the plea agreement, the government agreed, in consideration of promises in the plea agreement, not to seek that designation. *See* Plea Agreement, Doc. No. 842 at 4. Both parties additionally agreed not to seek "any departures from the guidelines range of 140 to 175 months." *Id.* However, due to the passage of an amendment changing the Guidelines calculation and changes in computation of his criminal history,[1] the government advised Clark

---

[1] Amendment 782 to the Sentencing Guidelines, passed in 2014, reduced the base level calculation for Clark from 32 to 30; Clark additionally resolved two state charges that changed the computation of his criminal history category.

prior to sentencing that it would not consider him to be in breach of the agreement if he advocated for the mandatory minimum sentence. *See* Trans. of Sent. H'rg. Doc. No. 2283 at 8. Judge Burns ultimately sentenced him to 140 months incarceration and five-years supervised release. *See* Judgment, Doc. No. 2153 at 1. That sentence was the longest of any sentence imposed in the 45-defendant case. *See* Def's. Mot. Doc. No. 2896 at 30.

Clark, who grew up in a high-crime neighborhood in New Haven, has struggled with substance abuse since the age of fifteen. *Id.* at 34. His mother was addicted to drugs throughout his childhood, and his father was arrested when Clark was 9 for a drug related offense. *Id.* at 37. He additionally suffered lead poisoning as a child; the resulting effects left him with a learning disability that made school extremely difficult. *Id.* at 34. Clark has a lengthy criminal record of convictions in state court, including attempted assault in the first degree and narcotics related offenses. *See* PSR Doc. No. 971 at ¶¶ 47-64.

### III.    Discussion

####    A. Exhaustion

Under the FSA, a defendant may bring a motion for compassionate release only after exhausting all administrative rights to appeal a failure of the BOP to bring such a motion, or after the lapse of 30 days from the filing of such a motion with the warden of the defendant's facility. 18 U.S.C. § 3582(c)(1)(A)(i); *United States v. Sturgis*, 2020 U.S. Dist. LEXIS 219102, at *9 (W.D.N.Y. Nov. 23, 2020).

Clark submits with his motion for release a response from the warden of Schuylkill, Scott Finley, denying his motion for compassionate release. *See* Exhibit A. The government concedes

---

*See* Def.'s Mot. Doc. No. 2896 at 4; *see also* Trans. of Sent. H'rg. Doc. No. 2283 at 7; *see also* U.S.S.G. Supp. to App'x C, Amend. 782.

that the exhaustion requirement has been met (even without additional records indicating that Clark appealed that decision). *See* Govt.'s Mot., Doc. No. 2899 at 6. Accordingly, I treat the exhaustion requirement as waived. *See, e.g., United States v. Leigh-James*, 2020 U.S. Dist. LEXIS 124546, at *17-18 (D. Conn. July 15, 2020) (even where record did not establish that defendant had fully exhausted all administrative rights to appeal, government had waived objection by conceding that exhaustion requirement had been met).

### B. **Extraordinary and Compelling Reasons**

#### i. *Medical Conditions and Vulnerability to Covid-19*

Clark indicates that suffers from multiple conditions that increase his risk of developing severe complications were he to contract Covid-19. Most significantly, he has a body mass index (BMI) of close to 30, which the CDC defines as "obese." CENTERS FOR DISEASE CONTROL, *People of Any Age with Underlying Medical Conditions* (June 25, 2020), https://www.cdc.gov/coronavirus /2019-ncov/ need-extra-precautions/people-with-medical-conditions.html. Clark additionally reports that he has been diagnosed with periodontal disease and has elevated blood pressure. *See* Def.'s Mot. Doc. No. 2896 at 15. Relying on CDC guidance, as well as other studies indicating that all three conditions may increase the risk of developing complications due to Covid-19, Clark contends that release is warranted based on those underlying medical conditions and the increased risk he faces of contracting Covid-19 while incarcerated.

The government maintains that Clark's medical conditions are not sufficiently severe to warrant release, even when coupled with the increased risk of contracting Covid-19 while incarcerated. *See* Govt.'s Mot. Doc. No. 2899 at 8-9. Specifically, the government notes that Clark has a BMI of 29.8, and that he therefore does not qualify as "obese" under CDC

guidelines. *Id.* at 7. The government additionally contends that without more recent blood pressure readings or dental records establishing periodontal disease, Clark has failed to satisfy his burden of establishing that either condition constitutes an extraordinary and compelling reason for relief under section 3582. *Id.* at 9.

Clark's medical records do not, as the government indicates, establish with specificity that he has a BMI of above 30 or has been formally diagnosed with hypertension or periodontal disease. However, they do establish that he has a BMI of almost exactly 30, has had multiple high blood pressure readings and suffers from unspecified periodontal issues. He additionally reports a history of asthma (but does not indicate that he received treatment for that condition). *See* Exhibit B; Exhibit G, Exhibit H.

The CDC's most recent guidance on Covid-19 identifies obesity (defined as a BMI between 25-30), hypertension (high blood pressure) and asthma as conditions that increase the likelihood that an individual will suffer severe complications due to a Covid-19 infection. *See* CENTERS FOR DISEASE CONTROL, *People of Any Age with Underlying Medical Conditions,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.[2]

Unfortunately, the risk of infection for Clark is not theoretical. Clark is currently in an environment where it is difficult, if not impossible, to take the necessary measures to protect himself against infection. Research on the virus has established that prison is one of the most dangerous places to be as the virus spreads; the difficulty of social distancing, lack of adequate

---

[2] Though the CDC does not identify periodontal disease as an underlying risk factor for serious complications due to Covid-19, some studies have suggested a link. *See, e.g.,* Sampson, V., Kamona, N. & Sampson, A., *Could there be a link between oral hygiene and the severity of SARS-CoV-2 infections?,* BR DENT J 228**,** 971–975 (2020), https://doi.org/10.1038/s41415-020-1747-8.

access to hygienic products and lack of air circulation mean that the rate of infection is very difficult to control. *See, e.g.,* Keri Blakinger & Keegan Hamilton, "*I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps*, The Marshall Project, https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps; *see also* Hagan LM, Williams SP, Spaulding AC, et al., *Mass Testing for SARS-CoV-2 in 16 Prisons and Jails — Six Jurisdictions, United States, April–May 2020.* MMWR Morb. Mortal Wkly. Rep 2020;69:1139–1143, *http://dx.doi.org/10.15585/mmwr.mm6933a3*. Currently, Schuylkill is reporting 81 confirmed cases of Covid-19 among inmates. *See* FEDERAL BUREAU OF PRISONS, COVID-19 Cases, https://www.bop.gov /coronavirus/ (last visited January 20, 2021).

Accordingly, although Clark's underlying medical conditions may not fit neatly into the categories defined by the CDC as certainly increasing an individual's risk of severe complications from a Covid-19 infection, the presence of those conditions combined with the high risk he faces of contracting Covid-19 at Schuylkill constitute extraordinary and compelling reasons for release.

      *ii.*     Severity of Sentence

Clark contends that the lengthy sentence imposed in this case was particularly harsh in light of the shorter sentences his codefendants received, and because the sentence did not account for an unwarranted disparity in the Sentencing Guidelines between offenses involving cocaine and those involving cocaine base. *See* Def.'s Mot., Doc. No. 2896 at 4. Clark additionally maintains that the "false spectre of career offender status [sic]" impacted the terms of his plea agreement in two significant ways. *Id.* at 29. First, he agreed to plead guilty to a charge with a mandatory minimum of ten years in the hopes of avoiding a career offender

designation. *Id.* Second, he did not argue at sentencing for a 1:1 crack-to-powder ratio, given the promise in the plea agreement not to seek a departure from the guidelines. *Id.* He notes additionally that he received the highest sentence in the 45-defendant case despite his subordinate role in the conspiracy. *Id.* at 5; *see also* PSR at ¶¶ 28, 99.

The government concedes that at the time of the plea agreement, Clark was told that he could face career offender designation, but indicates that by the time of sentencing, it was clear that designation did not apply. *See* Govt.'s Sur-Reply Doc. No 2903 at 1. The government notes that prior to sentencing, it "made plain" that Clark would not be in breach of the plea agreement if he sought a sentence as low as the mandatory minimum. *Id.* at fn. 1. Accordingly, the government maintains that Clark was free at that point to "press any argument available to him in seeking the mandatory minimum penalty." *Id.*

With respect to the length of the sentence as compared to the other defendants in this case, the government contends that Clarks' high sentence was the result of a "troubling criminal history" and notes that Judge Burns specifically commented at sentencing that she was conducting "individualized sentencings taking into consideration all the factors that have been brought to my attention" in each separate case. *See* Govt.'s Mot., Doc. No. 2899 at 11; *see also* Trans. of Sentencing H'rg., Doc. No. 2283 at 42. In light of those previous convictions and Judge Burns's careful consideration of his history, the sentence was not unwarranted or unjust.

I note initially that although the Fair Sentencing Act and amendments to that statute enacted by the FSA were passed with the goal of reducing the crack-to-powder disparity in sentencing, those statutes did not fully address the problem. *See* Fair Sentencing Act of 2010*,* 111 P.L. 220. Although some changes have been made to the statutory scheme (the crack-to-powder ratio is now 18:1 as opposed to 100:1 and the amount of crack cocaine required to trigger

mandatory minimums has been increased) a clear disparity remains. *Id.* Section 841 and the sentencing guidelines both distinguish between powder and crack cocaine, imposing higher mandatory minimums and sentencing ranges for offenses involving crack than those involving powder cocaine. *See Dorsey v. United States*, 567 U.S. 260, 269 (2012); 21 U.S.C. § 841(b)(1)(A); 18 U.S.C. Appx § 2D1.1.

In light of that unwarranted disparity, I and many other courts in this circuit and elsewhere have chosen to apply a 1:1 crack-to-powder ratio when calculating sentencing ranges under the guidelines. *See, e.g., United States v. Gardner*, 20 F. Supp. 3d 468, 473 (S.D.N.Y. 2014); *United States v. Jones*, 2019 U.S. Dist. LEXIS 218002, at *26 (D. Conn. Dec. 19, 2019); *United States v. Harris*, 2020 U.S. Dist. LEXIS 5132, at *19 n.2 (D. Conn. Jan. 13, 2020); *United States v. Juicy Reid-Stith, et al.*, No. 3:12-CR-161, Doc. No. 148 (D. Conn. June 13, 2014); *see also United States v. Canfield*, 758 F. App'x 51, 59 (2d Cir. 2018) ("[i]t has been well established since 2007 that district judges may reject a drug ratio in a guidelines calculation"); *Kimbrough v. United States*, 552 U.S. 85 (2007).

Here, Clark's lengthy sentence was based in part on the fact that the 18:1 ratio of crack to cocaine was applied in calculating his base level offense and the associated guideline range. *See* PSR, Doc. No. 971 at ¶ 38 (calculating base level offense using guideline provision for 280 to 840 grams of cocaine base); *see also* Trans. of Sen. H'rg. Doc. No. 2283 at 7; 18 U.S.C. Appx § 2D1.1 Additionally, he pleaded guilty to a charge with a mandatory minimum penalty of ten years under the mistaken impression that he could otherwise face a much higher sentencing range were he to be designated a career offender (a mandatory minimum that itself reflects the unwarranted disparity between crack and powder cocaine). *See* Def's. Mot. Doc. No. 2896 at 29.

I note additionally that Clark's high sentence compared to other defendants in this case, despite the allegedly subordinate role he played in the conspiracy, factors into my consideration of extraordinary and compelling circumstances warranting relief. *See, e.g., Haynes,* 456 F. Supp. 3d 496, 499 (E.D.N.Y. 2020) (considering disparity between defendants' sentence and the sentence imposed on co-defendant that "recruited" him). The harshness of the imposed sentence as compared to his co-defendants, the concern about career offender designation, and application of the 18:1 ratio all weigh heavily in favor of sentence reduction. That is especially true in light of the fact that Clark has already served over eight years.

After considering Clark's underlying medical conditions, the current level of outbreak of Covid-19 at Schuylkill and the lengthy sentence Clark received, based largely on an unwarranted sentencing disparity between crack and cocaine, I find that Clark has established extraordinary and compelling reasons for release.

### C. Section 3553(a) Factors

Even where a defendant establishes that extraordinary and compelling reasons support sentence reduction, a court reviewing a motion under section 3582(a) must additionally consider the sentencing factors set forth in section 3553(a). 18 U.S.C. § 3582. Accordingly, a court must examine "the nature and circumstances of the crime, the defendant's history and characteristics, and the multiple purposes of sentencing, such as providing just punishment, deterring crime, protecting the public from further crimes by the defendant, and providing the defendant with rehabilitation." *United States v. Miller*, 2020 U.S. Dist. LEXIS 217614, at *5 (D. Conn. Nov. 20, 2020); *see also* 18 U.S.C. § 3553(a). Although a court considering a motion by a defendant is no longer required to consider whether a defendant would pose a "danger to the community" as described by section 1B1.13, a court is still required by section 3553(a) to "consider…the need

to protect the public from further crimes of the defendant." *Vargas*, 2020 U.S. Dist. LEXIS 220531, at \*26. Accordingly, a court is required to weigh both a defendant's "recidivism risk and potential threat to the community at large." *Id.*

Here, Clark contends that release would comport with the section 3553(a) factors because he has already served over 101 months of his sentence—a sentence that was overly harsh when imposed. *See* Def.'s Mot., Doc. No. 2896 at 30. Clark maintains that had the 1:1 crack-to-powder ratio been applied and had the mandatory minimum not limited the court's discretion, his sentence could have been as low as 41-51 months. *See id.* at 3. Sentence reduction would not undermine the goal of promoting just sentencing, because his sentence was the longest of any defendant in his case, despite the fact that he did not have a leadership role in the conspiracy, nor was he charged with a violent offense or possession of a firearm. *Id.* at 30. Finally, Clark reports that he has made clear progress toward rehabilitation, engaging in vocational and substance abuse programs and worked toward getting his GED. *See* Exhibit F at 2.

Pointing to Clark's extensive criminal history, the government argues that Clarks' lengthy sentence was warranted, and additionally that his prior criminal history includes violent conduct, including assault in the first degree for shooting at a vehicle. *See* Govt.'s Mot. At 11. The government also relies on Clark's pivotal role in the conspiracy in this case, noting that he was Wilson's "right hand man." *Id.* at 12. Finally, the government indicates that Clark has received multiple disciplinary tickets while incarcerated (one for threatening bodily harm) which cut against his claim of rehabilitation. *Id.* at 10.

Initially, I note that the fact that Clark has already served the majority of his sentence weighs heavily in favor of release. Additionally bearing on my analysis are the circumstances of Clark's guilty plea, and the fact that he pleaded guilty based in part on a mistaken impression

that he could be subject to career-offender status. Finally, as discussed above, had the 1:1 ratio been applied at sentencing, Clark would likely have received a lower sentence. Accordingly, reducing his sentence at this point would not undermine the goals of promoting just sentencing or create unwarranted sentencing disparities between similarly situated defendants, especially in light of the fact that every other defendant in this case received a lower sentence. *See United States v. Wilson, et al.*, No. 3:12-cr-104 (RNC) (D. Conn. May 15, 2012); 18 U.S.C. § 3553(a)(6).

With regard to public safety, Clark's progress toward rehabilitation while incarcerated suggests that he is unlikely to recidivate, and therefore is unlikely to pose a danger to the community. Clark submits with his motion a detailed letter expressing the ways he has used his time while incarcerated to consider making changes to ensure that he can be a present father for his children. *See* Exhibit F at 2. He additionally submits multiple certificates of completion of various programs, including vocational training and educational course. *See* Exhibit D. Clark also has a detailed reentry plan, including plans of where he will reside if released, where he will seek physical and mental health treatment, and where he will seek substance abuse treatment. *See* Exhibit E at 2. Those detailed re-entry plans additionally support the conclusion that release would comport with the section 3553(a) factors.

IV.    **Conclusion**

For the foregoing reasons, I **grant** Clark's motion for sentence reduction and reduce his sentence to time served. He shall be immediately released from BOP custody. Upon release, Clark shall commence serving his five-year term of supervised release consistent with the conditions that Judge Burns already imposed. *See* Judgment, Doc. No. 2153. Clark must contact

the United States Probation Office as soon as possible, but in no event later than 72 hours after his release.

So ordered.

Dated at Bridgeport, Connecticut, this 20th day of January 2021.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge
